1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF MISSISSIPPI
2            SOUTHERN DIVISION

3

UNITED STATES OF AMERICA                    PLAINTIFF
4
V.                    CRIMINAL ACTION NO: 1:14CR77
5
HOSEA BLACKSTON                             DEFENDANT
6

7            TRANSCRIPT OF SENTENCING

8        BEFORE HONORABLE HALIL S. OZERDEN
         UNITED STATES DISTRICT JUDGE
9
             MAY 6, 2015
10          GULFPORT, MISSISSIPPI

11

12   COURT REPORTER:

13   KATI M. VOGT, RPR, RMR, CRR
     2012 15TH STREET, SUITE 403
14   GULFPORT, MISSISSIPPI  39501
     (228) 563-1751
15
     APPEARANCES:
16
     REPRESENTING THE GOVERNMENT:
17
             JOHN MEYNARDIE, ESQUIRE
18
     REPRESENTING THE DEFENDANT:
19
             DOYLE LEE COATS, ESQUIRE
20

21

22

23

24

25

1                                    INDEX
2                                                        PAGE

3    WITNESSES CALLED BY THE GOVERNMENT:

4                              DIRECT     CROSS      REDIRECT

5    Trey Collins               8          19         33

6

7    WITNESSES CALLED BY THE DEFENDANT:

                              DIRECT     CROSS      REDIRECT
8
     Matthew Becker             35
9
     Hosea Blackston            49
10

11
     CERTIFICATE OF COURT REPORTER                   84
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  Please be seated.

2          The next matter is 1:14cr77, United States versus Hosea

3    Blackston, scheduled for sentencing.

4          Would counsel please make their appearances for the

5    record?

6          **MR. MEYNARDIE:**  John Meynardie, for the United

7    States, Your Honor.

8          **MR. COATS:**  Doyle Coats, for the defendant, Hosea

9    Blackston.

10          **THE COURT:**  And, Mr. Coats, is your client present in

11    the courtroom?

12          **MR. COATS:**  Yes, sir.

13          **THE COURT:**  All right.  Mr. Meynardie, pursuant to

14    the Crime Victims Rights Act, are there any victims of this

15    offense?

16          **MR. MEYNARDIE:**  No, Your Honor.

17          **THE COURT:**  Has the government received the

18    presentence report and had a chance to review it?

19          **MR. MEYNARDIE:**  We have, and we have no objections.

20          **THE COURT:**  Mr. Coats, did you receive the

21    presentence report and the addendum and have a chance to review

22    them with your client?

23          **MR. COATS:**  Yes, Your Honor.

24          **THE COURT:**  Were you able to explain them to your

25    client and answer any questions he had about them?

1          **MR. COATS:**  Yes, Your Honor.

2          **THE COURT:**  And did he understand them?

3          **MR. COATS:**  Yes, he did, sir.

4          **THE COURT:**  I understand there are some objections

5     the defendant has raised to the presentence report; is that

6     correct?

7          **MR. COATS:**  That's correct, sir.

8          **THE COURT:**  Would you just summarize very briefly

9     what they are, and then I'll see if the government has any

10    evidence or argument to offer on them, and then I'll give you a

11    chance to offer any evidence you may have.

12         **MR. COATS:**  In summary, Your Honor, we are objecting

13    to the quantity of drugs that he's being charged with.  As to

14    the -- particularly as to the type, the indictment and

15    everything we had alleged methamphetamine.  And in particular,

16    that objection goes to the fact that what he's trying to do

17    with -- or what the -- what the probation officer has used is

18    the Ice part of the methamphetamine.  And to get there, you've

19    got to have a lab report because the guidelines say that

20    anything over 80, I believe is right, is deemed to be Ice.

21         Now, in this case before this Court, the only evidence of

22    any Ice is in the buy that he's pled guilty to in Count Six.

23    And that's -- that lab report -- and I'm not sure of any

24    others -- but that lab report says that it was a purity level

25    of 90-some-odd percent, which makes it Ice.  But it's clear

that he has alleged that my client had 4.5 kilograms, or dealt

in that much, in methamphetamine Ice.  Interesting enough, when

he did the report, he -- he -- the original PSR, he talked

about methamphetamine.  After we had the case conference, he

changed that -- a lot of that to Ice.  But it's our position

that that has no basis because there's no lab report supporting

that, and the only lab report supporting the Ice is the one in

the count that he pled guilty to, and I would submit to the

Court that count is Ice.  I mean, by sentencing guidelines,

that's Ice.  But that's not so in the rest of it, and it

shouldn't be included in the PSR.

Now, the next objection, there's an objection to the

importation of the drug in that there's no evidence -- no

credible evidence that shows that anyone brought this drug from

Mexico, and certainly my client wasn't apprised of that and

didn't know that.  Now, the next objection went to -- and the

drug was bought out of Texas.  That doesn't -- just because

Mexico is the next country over doesn't mean that it was

imported.  Nobody saw it imported.  There was no evidence, none

at all.

And he also objects to the finding by the probation

officer that he was the leader of some DTO.  And we've asked

for proof on that.  There's simply no proof.  He was -- he did

buy himself the dope and, as Your Honor knows, he pled guilty

to that and he has cooperated fully.  He gave a detailed

proffer to the agents, and the agents specifically said that

they wouldn't furnish that to the probation officer to be used

against him, and the first thing they brought up was the

proffer.

And he doesn't know where this narcotics was manufactured.

He has no idea.  I submit, Your Honor, that the only people

that would know whether this was Ice or just regular

methamphetamine or even the quantity is the lab.  When I asked

about that, I'm told there was no lab reports, so I don't even

know if it's methamphetamine.

What you have is a lot of mouthing, if you will, to these

agents and to the probation officer and the efforts by all the

other people to try to get the help for their own causes, and I

understand that.  And it's -- it seems that they want to

sentence him for amounts of narcotics that are just not there

and was never sent to a lab.  There's not even any proof that

it was methamphetamine.  It's just we all assume that because

they were selling it, and that -- and based on what these

proffer statements say, but that's it.  We have no evidence as

to whether this was Ice, and so it shouldn't be treated as Ice

if it wasn't Ice.

Now, the other -- well, we had the objection over the

leadership role in this thing.

Also there was a -- the firearm matter.  The defendant has

never owned a firearm, Your Honor, has never been accused of

1  using one.  He has a criminal record.  He is a -- he has never

2  been charged with a firearm.  There is no one in this

3  indictment, by the way, charged with a firearm.  There's no

4  notice whatsoever of the firearm matter.  And no -- and he has

5  stated in the proffer, as well, that he never possessed or used

6  a firearm, didn't know anything about these firearm deals.  He

7  wasn't there whenever any firearm was ever brandished, and had

8  he been, he would have run those people off because he doesn't

9  allow -- that's his family up there in Lucedale.  He lives up

10  there, and that's where his kids and everybody else is.  He

11  doesn't allow firearms around there.

12      What's happened here -- so we have those -- those

13  objections to those items; the quantity, the firearms, the

14  leadership role, and the -- all the enhancements, and the

15  importation, which there's no evidence of.

16      **THE COURT:**  All right.  Thank you, Mr. Coats.  I

17  understand the objections.

18      Let me call on the government to see if it has any

19  evidence or argument to offer on these objections.

20      **MR. MEYNARDIE:**  Your Honor, there's a lot of mix of

21  law and fact that I think were part of the argument, and I

22  think I need to call an agent, just to be cautious.

23      **THE COURT:**  All right.

24      **MR. MEYNARDIE:**  Trey Collins.

25      **THE COURT:**  Sir, if you'll please come forward.  Come

1   forward up here.  If you would, place your left hand on the

2   Bible, raise your right hand, face the courtroom deputy over

3   here, and take oath.

4                          TREY COLLINS,

5   was thereupon called as a witness and, having been duly sworn,

6   testified as follows:

7                       DIRECT EXAMINATION

8                          -  -  -

9        **THE COURT:**  Sir, please have a seat in the witness

10  box.  If you would, please speak into the microphone, speak up,

11  and speak slowly so the court reporter can hear you.

12       **THE WITNESS:**  Yes, sir.

13       **THE COURT:**  Mr. Meynardie?

14  **BY MR. MEYNARDIE:**

15  Q.   Would you state your name, please?

16  A.   George Collins.

17  Q.   And for whom are you employed?

18  A.   Jackson County Sheriff's Department, assigned to the FBI

19  Safe Streets Task Force.

20  Q.   Are you the primary case agent in this case?

21  A.   Yes, I am.

22  Q.   All right.  Let me start -- we're going to go through each

23  of the four objections in a little bit of detail, but first,

24  was Mr. Blackston interviewed not under -- I mean, I know he

25  was given a proffer at some point, a proffer agreement.  Was he

1    interviewed prior to that without the benefit of a proffer

2    agreement?

3    A.   Yes, he was.

4    Q.   All right.  And at that time, was he asked what quantity

5    of methamphetamine he was involved in?

6    A.   Yes, he was.

7    Q.   And what was the quantity he gave you?

8    A.   He gave an estimate.  The estimate basically -- I'd like

9    to read it directly, if that's okay.  He estimated that three

10   to four trips were made where methamphetamine was delivered,

11   and he estimated one and a half to two kilos were delivered

12   during those trips.  If we calculate it out, that comes four

13   and a half, actually up to eight kilos that could have possibly

14   been delivered, but we took the lower, lower amount.

15   Q.   So four and a half kilos is the lowest amount if you take

16   his estimates?

17   A.   That's correct.

18   Q.   Okay.  Now, if I'm right, there were six buys from various

19   individuals in this case; is that right?

20   A.   That's -- yes, I believe so.

21   Q.   What's the total quantity of methamphetamine that was

22   bought during those six buys?

23   A.   Okay.  I do not have a total quantity right in front of

24   me.  I do have the total quantities -- actually I do.  133.7

25   net grams.

1    Q.   My math is not going to be very good, but that's roughly

2    five ounces, six ounces?

3    A.   In that area.

4    Q.   Okay.  What were -- and all of those purchases were sent

5    to a laboratory; is that right?

6    A.   That's correct.

7    Q.   Were they all methamphetamine?

8    A.   Yes, they were.

9    Q.   What was the quality of that methamphetamine?

10   A.   The two in particular from Mr. Blackston, the first

11   purchase was 98.9 percent; the second purchase was

12   99.8 percent.

13   Q.   All right.  And the other four roughly the same?

14   A.   Yes.  They were all in the nineties, mid nineties up.

15   Q.   So there were no purchases you made from anyone in this

16   group that was not Ice.  Is that a fair statement?

17   A.   That's fair, yes.

18   Q.   Were there any historical statements you got from any

19   witnesses discussing the quality of the methamphetamine that

20   would raise doubts about whether they were importing Ice or

21   not?

22   A.   There were no statements made that would raise doubt to

23   that.

24   Q.   So all of these individuals who were involved in the sale

25   of it agreed that they were selling high-quality

1  methamphetamine?

2  A.   Every statement we've had, nothing has gone against that.

3  Q.   All right.  Now, obviously you purchased 133 grams.  You

4  couldn't have tested the other 4.2 kilograms because we didn't

5  have it; is that right?

6  A.   That's correct.

7  Q.   All right.  Now, let's move on to the importation.  What

8  evidence is there that this methamphetamine was coming from

9  Mexico as opposed to Texas or California?

10  A.   We have one statement that was made by a confidential

11  source in regards to a trip that was made to Texas to actually

12  -- to pick up quite a large quantity of methamphetamine.  The

13  trip was delayed due to the fact of an arrest of a high-ranking

14  official in Mexico, according to the person who made the trip

15  who relayed information to the CS.  Therefore, it took longer

16  to actually obtain the methamphetamine.

17  Q.   All right.  Because there was some disruption in the

18  supply in Mexico?

19  A.   That's right.

20  Q.   Is there any other evidence that it was actually imported?

21  A.   Just along with the high percentages.  I mean, we know --

22  Q.   Well, there's stuff that was subsequent to his guilty plea

23  that we've learned, but we're not going to use any of that?

24  A.   That's absolutely correct.

25  Q.   Okay.  But there was evidence that at least on one trip it

1   was delayed because of a problem with the supply in Mexico?

2   A.   That's correct.

3   Q.   And that was relayed to Mr. Blackston or not, or do we

4   know?

5   A.   I'm sorry?

6   Q.   Was Mr. Blackston made aware of that, or do we know?

7   A.   I do not know if he was made aware of that, but I would

8   think so, yes, because he had -- was one of the -- the

9   individual that sent the courier to make the trip.

10  Q.   All right.  Which brings me to my next question, or

11  objection, which was whether or not he was a leader of this

12  organization.  How many -- I know we indicted nine.  How many

13  individuals were involved in this group of methamphetamine

14  dealers?

15  A.   As far as the actual dealer itself or the actual DTO?

16  Q.   Well, the DTO, the -- and just so the record is clear,

17  what is a DTO?

18  A.   A drug trafficking organization.

19  Q.   In terms of the DTO.

20  A.   We did arrest in addition to Mr. Blackston eight other

21  individuals.  We have learned through statements obviously the

22  organization or the groups who were involved was actually

23  larger than that.

24  Q.   All right.  So at any rate, there were more than five

25  individuals involved?

1    A.   Absolutely.

2    Q.   Now, Mr. Blackston was identified by you, anyway, as one

3    of the top levels.  He was the one selling it to the other DTO

4    members; is that right?

5    A.   That's correct.

6    Q.   All right.  Was their relationship with some of these

7    people primarily buyer/seller or was there some -- and I'll get

8    to Ms. Nix in a moment, but was there some level of control

9    where he would tell them who to sell to or set the prices that

10   they sold them for?

11   A.   We did intercept a conversation in which someone had

12   called to purchase methamphetamine.  Mr. Blackston had one

13   price, would not come off the price.  The person had said,

14   "Well, that's what I'm selling it for," and basically the

15   conversation ended, "That's the price if you want it."  So he

16   was controlling that price.

17   Q.   Okay.  But not necessarily the price that the person was

18   selling downstream of him?

19   A.   That's right.

20   Q.   All right.  Let's talk, then, about this -- at least this

21   one occasion in which Ms. Nix went to Texas to pick up

22   methamphetamine; is that right?

23   A.   That's correct.

24   Q.   Tell us the circumstances of that.

25   A.   Basically Ms. Nix did take a trip, according to her -- her

1 interview and according to previous statements before we

2 actually made the arrest from confidential sources, to Texas to

3 obtain quite a large quantity of methamphetamine.  On arriving

4 there, Ms. Nix had to -- I believe it was Houston, without

5 looking directly at my notes -- Houston.  And I believe she

6 went on to San Antonio where she obtained the methamphetamine.

7 When she came back, she was followed by two other members, one

8 of them who has been arrested, back to Mr. Blackston's

9 residence.  And then according to Ms. Nix, she went in the

10 house.  Mr. Blackston and two of the other members went behind

11 the residence, and presumably they would have moved the

12 methamphetamine at that point.

13 Q.  All right.  But who would have sent Ms. Nix to Texas to

14 pick up this methamphetamine?

15 A.  Mr. Blackston.

16 Q.  All right.  Now, in terms of the firearms that -- the

17 objection on the firearms, is there any evidence that we have

18 that Mr. Blackston himself possessed a firearm?

19 A.  In the presence of or possessed himself?

20 Q.  Himself.

21 A.  No.

22 Q.  Okay.  So we don't disagree with the defense that he --

23 A.  No, absolutely not.

24 Q.  -- never possessed one himself.

25 A.  Yeah.

1    Q.  All right.  Is there evidence that there were firearms in

2    the possession of anyone else in this group or organization

3    while Mr. Blackston was present?

4    A.  Yes.

5    Q.  Tell us about that.

6    A.  One of the defendants had arrived at Mr. Blackston's

7    residence and apparently she was met by several Hispanic males,

8    several white males standing at the entrance of Mr.

9    Blackston's.  The issue was some methamphetamine had supposedly

10   -- either money or methamphetamine had been stolen.  We believe

11   it was some methamphetamine.  Ms. -- the defendant was met with

12   -- by I think it was two Hispanic males carrying guns.  The

13   situation by another DTO member was explained to her what was

14   going on, and at that point, one of the Hispanic males and Mr.

15   Blackston approached the defendant and also reiterated some of

16   the issues that were going on.  Therefore, Mr. Blackston would

17   have had to have been there with the males with the guns.

18   Q.  When you say "approached the defendant," do you mean the

19   cooperating source?

20   A.  I'm sorry?

21   Q.  You said Mr. Blackston and one -- someone approached the

22   defendant.

23   A.  Our corroborating source.  That's correct.

24   Q.  All right.  So I'm clear, the source came to where they

25   were, and the Hispanic male and Mr. Blackston approached them

1  and brandished a firearm or --

2  A.  Yes.  Yes.  The Hispanic males were brandishing a firearm.

3  It was not said that Mr. Blackston had one himself.

4  Q.  Okay.  And that was because there was some missing

5  methamphetamine or money?

6  A.  That's correct.

7  Q.  Is there any other evidence of firearms used in this --

8  during the course of this conspiracy?

9  A.  Well, during this same issue, when the Hispanic males had

10  left that area looking for the methamphetamine, they also

11  brandished firearms towards someone who had been accused of

12  stealing the methamphetamine.  One of the witnesses stated that

13  they I won't say physically restrained but would not allow the

14  female to leave until they discussed the missing

15  methamphetamine.

16  Q.  All right.  Mr. Blackston was present?

17  A.  He was not present at that one, no.

18  Q.  Okay.  So he was present only at the prior one?

19  A.  That is correct.

20  Q.  Is there any other evidence that he was aware -- let me

21  step back from that.

22  The only evidence we have of firearms is really this --

23  they refer to themselves as the Puerto Rico Mafia, or someone

24  referred to them as the Puerto Rico Mafia?

25  A.  Right.  They were mentioned -- the firearms were also

1  mentioned in the Title III intercept between Mr. Blackston and

2  Mr. Calvin Allen.

3  Q.  Tell us about that.

4  A.  Okay.  It was on May 22, 2014.  As we said, we had a Title

5  III intercept of Mr. Blackston's phone.  I'd like to read just

6  a brief transcript, if I can, of the incident.

7  Q.  All right.

8  A.  Mr. Blackston:  "I just been in there for a" -- excuse me.

9  "I just been in there for a minute, me and my roomy, trying to

10  think about them guns.  That's what I been trying."

11      Now, I need to back up a moment.  We had brought Mr.

12  Blackston in and interviewed him and we had asked him a lot of

13  questions regarding information that confidential sources had

14  provided.  That's what led to this conversation.  I'll start

15  over.

16      Mr. Blackston:  "I just been in there a minute, me and my

17  roomy, trying to think about them guns.  That's what I been

18  trying."

19      Mr. Allen:  "You -- you trying to think how he came up

20  with that?"  I assume referring to myself in the interview.

21  Q.  Because y'all had asked them about the guns?

22  A.  Yes.

23  Q.  Okay.

24  A.  Mr. Blackston:  "Yeah."

25      Mr. Allen:  "I don't know how they come up with that.

1    Somebody had to tell them that, bro.  Somebody had to tell them
2    that.  But see, only thing about it, you got to look at it --
3    one thing about it.  What -- what -- what did they say?  Did
4    they ask where they was now?"  Referring back to the guns.
5          Mr. Blackston:  "No, only they say what they getting it
6    for.  They was asking about the guns.  I said those legal guns
7    they got.  Know what I'm saying?  Because I knew they knew
8    about the guns.  I said them legal guns."
9          Mr. Allen:  "Nuh-uh."
10         Mr. Blackston:  "Who they getting them from?"  And that
11   was him almost mimicking our question that we asked him.  "Who
12   they getting them from?  I said I don't know."  There was an
13   indiscernible comment made.  Then he says, "Oh, come on,
14   Bulldog."  Again, he's mimicking us.
15   Q.   And "Bulldog" is Mr. Blackston?
16   A.   That's Mr. Blackston.  "Oh, come on, Bulldog, you know.  I
17   said I don't know the person they got them guns from.  I don't
18   know the dude's name."
19         Mr. Allen states:  "Hmm.  So they really -- they really --
20   they really screwed out of their mind focused on strictly that,
21   on them."
22         And Mr. Blackston says, "Yeah, and the crystal."
23   Q.   Okay.  So the gun reference there that you were asking
24   about had to do with the Puerto Rico Mafia?
25   A.   That's correct, actually receiving guns at the assistance

1    of Mr. Blackston.

2    Q.   Okay.  So in your interview with Mr. Blackston not under

3    proffer, you had been asking him about whether he had provided

4    guns to the Puerto Rico Mafia?

5    A.   The question was asked.  I don't think it was ever

6    directly answered by Mr. Blackston.

7    Q.   Okay.  So that's what this conversation between Mr.

8    Blackston and Mr. Allen was about.  It was about your

9    questioning?

10   A.   That's correct.

11   Q.   All right.

12              **MR. MEYNARDIE:**  I tender the witness, Your Honor.

13              **THE COURT:**  Cross-examination, Mr. Coats?

14              **MR. COATS:**  Just a few, Your Honor.

15                          CROSS-EXAMINATION

16                             - - -

17   **BY MR. COATS:**

18   Q.   What was your name again, sir?

19   A.   George Collins.

20   Q.   And you are a deputy sheriff?

21   A.   Yes, sir, assigned to the FBI Safe Streets Task Force.

22   Q.   Okay.  And when was -- what period of time are you talking

23   about here, sir?

24   A.   I'm sorry?

25   Q.   When was your testimony concerning?  What date?  What

1  period of time?

2  A.   The investigation began October of 2013.  Is that what

3  you're asking me?

4  Q.   Is that when you were talking to Mr. Blackston?

5  A.   No, sir.  They -- and to keep me from having to dig

6  through all my notes here -- would have been in -- it would

7  have been in April.  It would have been before the end of the

8  Title III intercept.

9  Q.   Okay.  And did you take this information and make any

10  arrests for any guns?

11  A.   We did not make any arrest on a gun, no, sir.

12  Q.   Okay.  Did you find any guns?

13  A.   We found guns with DTO members.  Mr. Blackston was

14  arrested in Mobile.

15  Q.   What, now?

16  A.   We did get guns off some of the DTO members.  Mr.

17  Blackston was not arrested in George County --

18  Q.   What DTO member?

19  A.   Mr. Anderson.

20  Q.   Okay.  And was he indicted for that?

21  A.   No, he was not indicted for the guns.

22  Q.   And I -- that's the first I've heard of that one.

23  A.   Okay.

24  Q.   Did you find guns on anybody else?

25  A.   During the investigation?  Yes, sir.

1   Q.  Did you arrest them for it?

2   A.  Samuel McDaniel actually had guns on him.

3   Q.  Who?

4   A.  Samuel McDaniel, one of the co-defendants.

5   Q.  Was he charged with that?

6   A.  No, sir, he was not.

7   Q.  Well, why not?

8       **MR. MEYNARDIE:**  Object to that.  That would not be

9   within the purview of this agent to decide who is charged and

10  for what.

11      **THE COURT:**  I'll sustain the objection.

12      Let's move on.

13  **BY MR. COATS:**

14  Q.  Is this guy licensed to carry a gun?

15  A.  Is who licensed to carry a gun?

16  Q.  Was he licensed to carry a gun?

17  A.  Who?

18  Q.  The guy, the Daniels or whoever that was you said you took

19  the gun off of.

20  A.  Mr. McDaniel?

21  Q.  Yeah.

22  A.  Not that I'm aware of.

23  Q.  Was he an agent?

24  A.  An agent?

25  Q.  Yeah.

1    A.   No, sir.

2    Q.   You said he was a DTO member?

3    A.   That's correct.

4    Q.   And I'm assuming that is what you call a drug trafficking

5    organization or something; is that --

6    A.   Drug trafficking organization, yes, sir.

7    Q.   This gun, was it being used to further the interests of

8    the DTO?

9    A.   When we arrested Mr. McDaniel or when we interviewed him,

10   when we did do a search warrant, there was a gun present.  The

11   same with Mr. Anderson.

12   Q.   Did he threaten you with it?

13   A.   I'm sorry?

14   Q.   Did he use it to further the interests of the DTO?

15   A.   I couldn't tell you if he used it or not.

16   Q.   You couldn't tell us whether or not he threatened you with

17   it?

18   A.   No, sir, he did not.

19   Q.   Okay.  Now, what about these -- you said that of this

20   4.5 kilograms --

21   A.   Yes, sir.

22   Q.   -- of methamphetamine, that that was sent off to the lab?

23   A.   No, sir, I did not say the 4.5 was sent off to the lab.

24   Q.   Oh, I must have misunderstood that.  You said it was Ice,

25   didn't you?

1    A.   I said 4.5 grams of crystal methamphetamine was purchased

2  and what we did test was Ice.

3    Q.   All right.  So how much did you test?

4    A.   We've had two purchases from Mr. Blackston.  The first one

5  was 27.9 grams --

6    Q.   Okay.

7    A.   -- at a 98.9 percent purity.  The second purchase, 54.6

8  grams --

9    Q.   How much?

10   A.   54.6, at 99.8 percent purity.

11   Q.   All right.  And that's it?

12   A.   That's correct.

13   Q.   All right.  So you didn't send any of the rest of it off?

14   A.   That's correct.

15   Q.   So you don't know what the purity was?

16   A.   I can only speak of what we purchased.

17   Q.   Sir?

18   A.   I can only give you the facts of what I have in front of

19 me what we purchased on those two lab reports --

20   Q.   That's what --

21        MR. COATS:  Wait, wait, wait.  One person at a time.

22 She can't type two people at once.  Let him finish his answer,

23 Mr. Coats.

24   A.   We have two lab reports available:  One for the first

25 purchase of 27.9 grams with the percentage I gave you, and then

on the 54.6 grams of the 99.8 percent are the two lab reports

available.

**BY MR. COATS:**

Q.  Wait a minute.  You gave me different figures.  You've got two purchases?

A.  That's correct.

Q.  And both of them had a purity over 90?

A.  Absolutely.

Q.  Okay.  And those two purchases, how much narcotics total was it?

A.  Between the two, I don't have them added together right now, but it's 27.9 grams was the first one; 54.6 net grams is the second one.

Q.  Fifty-four?

A.  Yes, sir, 54.6.  54.6.

Q.  All right.  And how much does that come to?  Add it up.

A.  It's going to be roughly three ounces.

Q.  Huh?

A.  It's going to be close to approximately three ounces.

Q.  Three ounces?

A.  Approximately three ounces.

Q.  Okay.  So how many ounces is there in a kilogram?

A.  I --

Q.  A lot more than three ounces, isn't it?

A.  Oh, absolutely.

1  Q.  And in 4.5 kilograms, there would be a whole bunch of

2  ounces?

3  A.  That's correct.

4  Q.  And you didn't send none of that off?

5  A.  That's correct.

6  Q.  You didn't get it, did you?

7  A.  That's correct.

8  Q.  And if you had got it, you would have sent it off,

9  wouldn't you?

10  A.  That's correct.

11  Q.  All right.  So what we're talking about here is a lot of

12  smoke; is that right?

13  A.  That's not correct.

14  Q.  A lot of dicta?

15  A.  I'm sorry?

16  Q.  A lot of dicta, a lot of people making statements with no

17  evidence; is that right?

18  A.  We base our evidence on the Ice on these two purchases.

19  Q.  What?

20  A.  We base our evidence on the lab reports that we have of

21  the two purchases.

22  Q.  Okay.  All right.  And that's all I'm asking you about,

23  that and the rest of what you're trying to -- the rest of what

24  the probation office is trying to charge my client with, and

25  that's what I'm asking you about.

1          Now, you say Mr. Blackston was a leader of this DTO; is

2    that correct?  Is that what you said?

3    A.   That's correct.

4    Q.   And you base that on what?

5    A.   I base it on statements where he did control at least on

6    one occasion for someone to go actually pick up methamphetamine

7    from Texas and have it brought back.

8    Q.   Okay.  So where he ordered some dope and then paid for it?

9    A.   Also base it on statements made through the Title III

10   intercept where he was shown controlling the price of the

11   methamphetamine.

12   Q.   He was charged with buying and selling it, wasn't he?

13   A.   I'm sorry?

14   Q.   He was charged in the indictment with buying and selling?

15   That's what he pled guilty to, isn't it?

16   A.   That's correct.

17   Q.   Okay.  Now, did you ever tell any of these people or go to

18   Mexico and observe them going to Mexico and getting any of this

19   dope?

20   A.   I did not.

21   Q.   So you never saw any importation of it?

22   A.   I never saw him go to Mexico.

23   Q.   All right.  And you don't have any evidence of it, either,

24   do you?

25   A.   Beyond the high purities?

1  Q.  What?

2  A.  Beyond the high purities and the statements made by the --

3  Q.  You're only going to have two high purities; is that

4  correct?

5  A.  That's correct.

6  Q.  All right.  And in addition, you don't know where that

7  came from, do you?

8  A.  Can I make sure I understand your question correctly?  Are

9  you asking --

10  Q.  Did it come from Texas?

11  A.  The courier did pick it up in Texas.  That's correct.

12  Q.  Courier got it in Texas?

13  A.  That's correct.

14  Q.  Not Mexico; is that right?

15  A.  I know the courier went to Texas to pick up the

16  methamphetamine.

17  Q.  All right.  Now, what kind of weapons were these, anyway?

18  A.  Which weapons in particular?  The ones we took off the

19  other DTO members?

20  Q.  The weapons that you are making allegations about in this

21  case.

22  A.  They were described as AR-15 style assault rifles.

23  Q.  Uh-huh.  And no arrest was made for these machine guns in

24  front of people?

25  A.  No, sir.

1    Q.   Are you in charge of enforcing the law on people with

2    automatic weapons like that?

3    A.   Yes, sir.

4    Q.   Why did you not arrest them?

5    A.   The investigation's not over yet.

6    Q.   What?

7    A.   The investigation's not over yet.

8    Q.   Did you ever arrest them?

9    A.   To this date, not -- no, sir, not as of yet.

10   Q.   Was there ever any evidence that Mr. Blackston had any of

11   these guns in his possession?

12   A.   Physically holding or in presence of?

13   Q.   Did he ever have them in his possession?

14   A.   Never had a statement Mr. Blackston owned a firearm.

15   Q.   Okay.  Now, you claim Mr. Blackston was some sort of a

16   leader of this alleged DTO; is that correct?

17   A.   That's correct, yes, sir.

18   Q.   And you claim that these people were Puerto Rican Mafia or

19   something; is that correct?

20   A.   That was relayed to us, but that was not the claim that we

21   made.  But yes, they were labeled as the PRM initially.

22   Q.   What does a PRM look like?

23   A.   That was according to a confidential source who gave the

24   term, so I could not tell you.

25   Q.   I notice you smiling.  Because you didn't believe that,

1   did you?

2     A.  Believe what?

3     Q.  That these people were Puerto Ricans.

4     A.  At the initial investigation, we did not know.

5     Q.  Still don't, do you?

6     A.  Yes, we do.

7     Q.  Huh?

8     A.  Do we not know who they are?  Are you asking do we not

9   know who they are?

10    Q.  Are they citizens of this country?

11    A.  Some.

12    Q.  Did you find anybody that wasn't a citizen?

13    A.  Without exposing further investigation, I cannot --

14    Q.  That's all you need to say is yes or no.

15    A.  We did not arrest anyone that was not a citizen of the

16   U.S.

17    Q.  Puerto Ricans are citizens, aren't they?

18    A.  I didn't say they were or weren't.  I'm saying we did not

19   arrest anyone that wasn't a citizen of the United States.

20    Q.  Are you claiming to say that Mr. Blackston was a Puerto

21   Rican mafiosa?

22    A.  No, sir.

23    Q.  Does he look like one?

24    A.  No, sir.

25    Q.  Okay.  So do you know who the five people were that he is

1  in charge of, that he controlled their finances and all that?

2  A.  We know the people who did receive methamphetamine from

3  Mr. Blackston.

4  Q.  What?

5  A.  We know how the methamphetamine came into Mr. Blackston,

6  and we also know the people who were getting it from Mr.

7  Blackston.

8  Q.  So you know that he bought meth and that he sold meth?

9  A.  That's correct.

10  Q.  And you know that you had two buys that you sent off for

11  the purity level; is that correct?

12  A.  That's correct.

13  Q.  And so you could say they were Ice because the guidelines

14  say that if it's over purity level of 80, it's Ice; is that

15  right?

16  A.  I'm sorry.  Repeat that, please.

17  Q.  Well, anyway.

18      So it wasn't you that told the probation officer to say

19  that all this methamphetamine was Ice, was it?

20  A.  Was it me that told the probation officer?

21  Q.  Yeah.  Somebody did.

22  A.  It's not my place to tell the probation officer.  I

23  provide the material and the reports to probation.

24  Q.  You never talked to the probation officer?

25  A.  Sure, we talked.

1   Q.  Huh?

2   A.  We discussed clarity, clarifying what reports mean.

3   Q.  Well, and were you the one that told him the amounts of

4   the narcotics?

5   A.  That's correct.

6   Q.  So you didn't tell him that you only had two buys that

7   were sent off to the lab, did you?

8   A.  I provided the lab reports and I provided the buys that

9   shows the two --

10  Q.  And the purity levels?

11  A.  -- purity levels.  That's correct.

12  Q.  Okay.  Did he ask you for the rest of it?

13  A.  No, he did not.

14  Q.  So that was all the proof?

15  A.  The two buys were the proof.

16  Q.  All right.  And there is no other evidence, then, relative

17  to Mr. Blackston that we need to be concerned about, about the

18  quantity, is there?

19  A.  The quantity is as I stated with the lab reports that we

20  had tested.

21  Q.  All right.  Let's see.  Now, if Mr. Blackston had been in

22  possession of a firearm, you would have arrested him, wouldn't

23  you?

24  A.  If Mr. Blackston had -- I'm sorry.  You're going to have

25  to clarify --

1    Q.  If he had been in possession of a firearm of any type, you

2    would have arrested him right then, wouldn't you?

3              **MR. MEYNARDIE:**  Your Honor, I object to this as

4    completely speculative, and we're really going over the same

5    ground over and over again.  The witness has testified they

6    never found him with a gun, they have no evidence that he had

7    personally a gun, and I'm just not sure where we're going with

8    this.

9              **MR. COATS:**  That's --

10             **THE COURT:**  Why -- he's already said that Mr.

11   Blackston didn't possess a gun, so I'm not sure where --

12             **MR. COATS:**  Okay.  One moment, Your Honor.

13             **THE COURT:**  Okay.

14   **BY MR. COATS:**

15   Q.  Did you say that Mr. Blackston was dealing with Larry

16   Daniels in 2013?

17   A.  I don't know a Larry Daniels.  I'm sorry.

18             **THE DEFENDANT:**  Larry Anderson.  Anderson.  Larry

19   Anderson.

20             **THE COURT:**  Larry Anderson.

21   A.  The investigation began in October of 2013.  And during

22   the investigation, we determined that Mr. Anderson had been

23   dealing with Mr. Blackston.

24   **BY MR. COATS:**

25   Q.  In 2013?

1    A.   During that time frame, yes.

2    Q.   Were you aware that that gentleman was in prison?

3    A.   Yes, sir, I was.

4    Q.   So --

5    A.   But not during the whole time of the investigation.

6            **THE COURT:**  Wait.  Let him finish his answer, Mr.

7  Coats.

8    A.   He was not for the whole time of the investigation.  He

9  did -- he was revoked on parole for a point.  He was sent off

10  to -- on his revocation, and then he returned.  During 2013, he

11  wasn't in prison the whole time during October of 2013 -- or

12  I'm sorry -- during all of 2013.

13  **BY MR. COATS:**

14    Q.  All right.

15            **MR. COATS:**  Nothing further from this witness.

16            **THE COURT:**  All right.  Any redirect, Mr. Meynardie?

17            **MR. MEYNARDIE:**  Just briefly, Your Honor.

18                    REDIRECT EXAMINATION

19                        - - -

20  **BY MR. MEYNARDIE:**

21    Q.  Agent Collins, just so the record is very clear, there

22  were two buys from this defendant; is that correct?

23    A.   That is correct.

24    Q.  But there were an additional four buys from other

25  defendants; right?

1    A.   That's correct.

2    Q.   And were they receiving their drugs from Mr. Blackston?

3    A.   That's correct, according to statements, yes.

4    Q.   All right.  And the quality of the methamphetamine on

5    these other four buys, was it similar to the two that were

6    bought from Mr. Blackston directly?

7    A.   Yes, that's correct.

8    Q.   Now, when you interviewed Mr. Blackston about the quantity

9    of methamphetamine that he had received from the individuals in

10   Texas, did he give you a price that he was paying per kilogram?

11   A.   I believe he had pointed out $28,000 in his interview.  I

12   would have to go back and look at that specifically.

13   Q.   Was the price consistent with low-quality methamphetamine?

14   A.   Absolutely not.

15   Q.   This was the cost of a kilogram of -- or as you know it,

16   of a kilogram of Ice; is that right?

17   A.   Yes, that's correct.  I'm sorry.  If I can -- 21,000 is

18   what he had stated.

19   Q.   All right.  And from your experience, is that the price of

20   Ice?

21   A.   That would be consistent.

22   Q.   Okay.  Now, did Mr. Blackston mention at all in this

23   interview the attempt by Mr. Guzman to purchase firearms in

24   George County?

25   A.   Did he advise that Mr. Guzman had attempted to -- I do not

1 recall.

2 Q.  Was there any evidence at all, just to restate it one more

3 time, that these 4.5 kilograms of methamphetamine were anything

4 other than high-quality methamphetamine?

5 A.  There's nothing to prove anything other than.

6 **MR. MEYNARDIE:**  That's all I have, Your Honor.

7 **THE COURT:**  Agent Collins, you can step down.  Thank

8 you agent for your time.

9 Any other witnesses?

10 **MR. MEYNARDIE:**  No, Your Honor.

11 **THE COURT:**  Do you have any witnesses you wish to

12 call on behalf of the defendant, Mr. Coats?

13 **MR. COATS:**  We'd like to call Matthew Becker at this

14 point, Your Honor.

15 **THE COURT:**  All right.  Officer Becker, please come

16 forward.  If you would, come forward and place your left hand

17 on the Bible, raise your right hand, and take the oath.

18 <u>MATTHEW BECKER</u>,

19 was thereupon called as a witness and, having been duly sworn,

20 testified as follows:

21 DIRECT EXAMINATION

22 - - -

23 **THE COURT:**  Mr. Becker, please have a seat in the

24 witness box.

25 Go ahead, Mr. Coats.

**BY MR. COATS:**

Q.  State your name, please, sir.

A.  Matthew Arthur Becker.

Q.  And what do you do for a living?

A.  I'm a U.S. probation officer.

Q.  All right, sir.  Are you assigned to the defendant in this case, Mr. Hosea Blackston?

A.  I was assigned to his presentence investigation, yes, sir.

Q.  All right.  And did you prepare such an investigation?

A.  I did.

Q.  A report?

A.  Yes, sir.

Q.  And, now, would you refer to that report, sir?

A.  I'm sorry, sir?

Q.  Do you have it there?

A.  I have a copy here along with the addendum I prepared, as well.

Q.  All right.  And when you prepared that report, I notice that in the original report there, you mostly just put methamphetamine and you don't make any mention of Ice.

A.  I believe I did make mention of Ice in the summary of the guideline calculations where I explained how I calculated the guidelines the way I did.

Q.  Yes, you did, but then when you -- when you did the addendum later on --

1   A.   Yes.

2   Q.   -- you made sure that you put Ice in there everywhere

3   there was methamphetamine, didn't you?

4   A.   Well, I also included a statement at the end clarifying

5   that any methamphetamine used to calculate the guidelines range

6   in this case was Ice.  I included that statement, also, to

7   clarify where if I had left out the label, the guidelines were

8   calculated like that from the beginning.

9   Q.   Okay.  Did you have copies of the lab reports that were

10   sent to the lab?

11   A.   Yes, sir.

12   Q.   And they sent back?

13   A.   Yes, sir.

14   Q.   Okay.  And there was only two; is that correct?

15   A.   There were two relating to purchases directly affiliated

16   with your client.

17   Q.   Yeah.

18   A.   I had the others that Agent Collins mentioned on the

19   stand, as well.

20   Q.   But there was no lab reports, was there?

21   A.   Outside the reports I got, there were no additional lab

22   reports, no, sir.

23   Q.   Outside the two lab reports?

24   A.   Outside the two connected to your client and the others

25   that were taken off other members of the --

1    Q.  Did you have lab reports?

2    A.  Yes.

3    Q.  They said they only sent two up.

4    A.  They said they only sent two, if I remember the testimony,

5    two regarding transactions with your client.  There were other

6    lab reports that were done with other members of the drug

7    trafficking organization.  I received those lab reports, as

8    well.  I believe the total was six.

9    Q.  But that wasn't used in determining the 4.5, was it?

10   A.  No, sir.  I imagine that those were included in the

11   methamphetamine your client spoke about to Agent Collins, but I

12   have no way of knowing that for sure.

13   Q.  You had the proffer statement, didn't you?

14   A.  I did have a proffer statement.

15   Q.  And the agent had said he wasn't going to furnish it to

16   you, didn't he?

17   A.  Our office routinely receives proffer statements, sir.  We

18   don't use information from them in calculating the guidelines,

19   but we frequently put them in the report as evidence of the

20   defendant's cooperation, if nothing else.

21   Q.  Now, did you have -- so you've only got -- you got two

22   reports from the FBI lab.  I'm assuming that was the FBI lab,

23   or was that the State lab?

24   A.  I would have to go back.  I have the lab reports on my

25   desk.  I don't recall off the top of my head.

1    Q.   Well, let's get the lab reports.

2           **THE COURT:**  You may step down and get them.

3    A.   (Witness complies.)  My apologies, Mr. Coats.  I have them

4    here.

5    **BY MR. COATS:**

6    Q.   So how many lab reports do you have there?

7    A.   Actually I have a total of seven lab reports here.

8    Q.   Okay.

9    A.   And they're all from the U.S. Department of Justice Drug

10   Enforcement Administration Laboratory.

11   Q.   All right.  And those were furnished to you?

12   A.   They were furnished as part of the discovery materials.

13   Q.   What?

14   A.   Furnished to me as part of the discovery materials, the

15   materials I receive to prepare the presentence report.

16   Q.   You're not saying they were furnished to me.

17   A.   I have no idea if they were furnished to you.

18          **MR. COATS:**  Your Honor, may I approach the witness?

19          **THE COURT:**  You may.

20   **BY MR. COATS:**

21   Q.   Mr. Becker, look at those lab reports there.

22   A.   Yes, sir.

23   Q.   And tell me how you can relate that to Mr. Blackston.

24   A.   Yes, sir.  I'll first go to the lab reports for the

25   purchases on February 26, 2014, and February 28, 2014.

1    Q.   Okay.  Just a moment.

2    A.   Okay.

3    Q.   Is there -- is Mr. Blackston's name on that?

4    A.   No defendants' names are on the lab reports.

5    Q.   Well, how can you relate that to Mr. Blackston?

6    A.   The amount sent matched the purchase from Mr. Blackston on

7    -- let's say -- we'll use the 2/26/14 purchase date.  That is

8    the 27.9, so that matched the purchase from him, and that is --

9    and that's it.  There are no defendants' names.  I don't think

10   I've ever seen a defendant's name on a lab report.

11   Q.   That wasn't the question.

12   A.   Well --

13   Q.   How can you -- who are the others on?

14   A.   I would have to reference the presentence report.

15   Q.   What?

16   A.   I would have to reference the presentence report in order

17   to --

18   Q.   Safe to say they're not on Mr. Blackston?

19   A.   Two of them are.

20   Q.   All right.

21   A.   Directly on him.

22   Q.   Well, indirectly?

23   A.   Indirectly, the other four or other five were purchased by

24   other members to which Mr. Blackston has been connected but

25   was, the impression I have, not present at those transactions.

1    Q.   How do you know that they didn't just give you a bunch of

2    reports?

3    A.   I trust the lab, and I trust the agents and the AUSA who

4    provide discovery that they're giving me material based on the

5    case I'm working.

6    Q.   Yeah, but how do you know it's on the right case?  It's

7    easy to get papers confused.  You're up here testifying, sir,

8    and I'm asking you, how can you tie those arguments with Mr.

9    Blackston?

10   A.   I went over each of these lab reports by telephone with

11   the case agent and confirmed with him that, for example, this

12   first one matches the first purchase date of October 2nd, the

13   second one matches the purchase on 10/29.  And I went through

14   all of them, and he confirmed for me that these were in

15   connection with the case I'm investigating or was

16   investigating.

17   Q.   Who is "he"?

18   A.   The agent, Trey Collins.

19   Q.   Huh?

20   A.   The agent, Mr. George Trey Collins, the case agent in this

21   case.

22   Q.   What about the FBI agent?

23   A.   That's who I'm talking about, sir, the FBI task force

24   agent.

25   Q.   You're talking about Mr. Trey Collins?

1    A.   That's correct, sir.

2    Q.   Okay.  Now, I made these same objections to the PSR that

3    the defendant reviewed, by the way, and went over with me, and

4    then we had a case -- what do you call that -- a case

5    conference?

6    A.   A presentence conference, sir.

7    Q.   Sir?

8    A.   A presentence conference, yes, sir.

9    Q.   Yeah.  And we reviewed those?

10   A.   Yes, sir.

11   Q.   And we were not able to come to any conclusions or

12   anything?

13   A.   That is correct.

14   Q.   All right.  So then you did a -- I think what happened

15   then was I wasn't sure if you were going to do an addendum or

16   what you were going to do, so I went ahead and I did a

17   sentencing memorandum and filed it with the Court because we

18   were getting a little short on time and I was worried about

19   that.  So then I got your report.  I did not respond to that

20   because I didn't have hardly any time, but the responses would

21   have been substantially the same.

22            **THE COURT:**  I received your memorandum, and I did

23   read it.

24            **MR. COATS:**  Sir?

25            **THE COURT:**  I received your memorandum, and I did

1    read it.

2              **MR. COATS:**  Yes, okay.

3    **BY MR. COATS:**

4    Q.  And I noted you were talking about my computation.  That

5    was made, by the way, considering this as it's meth.  But that

6    computation that you prepared, and I think it's -- let's see if

7    I can remember -- about page 10 or something.

8    A.  Are you talking my addendum, sir?

9    Q.  Yeah, over in your addendum.

10   A.  All right.

11   Q.  Take a look at that, if you will.

12   A.  I will, yes, sir.  It's on page 7, the second to last

13   page.  I found it.

14   Q.  Page 7?

15   A.  Yes, sir, page 7 of my eight-page addendum.

16   Q.  What was the quantity of narcotics on that computation you

17   made?

18   A.  On that computation I made, it was made on -- based on the

19   scenario if the Court had sustained your objection, so it would

20   have been just the quantity from the February 26, 2014,

21   transaction, which is 27.5 grams --

22   Q.  Yeah.

23   A.  -- of methamphetamine Ice.

24   Q.  And that's the one he pled guilty to?

25   A.  That's correct.

1    Q.  And it's based on it being Ice?

2    A.  Correct.

3    Q.  Okay.

4          **MR. COATS:**  And had I had that at the time I filed

5    these reports, Your Honor, we would have admitted that

6    particular computation right there and said that that is

7    correct on the computation, except that the enhancements

8    shouldn't be in there.

9          **THE COURT:**  All right.  I understand.

10         **MR. COATS:**  Yes, sir.  Just so that we can correct

11   some of that.

12   **BY MR. COATS:**

13   Q.  Now, and you were pretty straightforward on the firearms.

14   That was -- there was no real evidence of that other than some

15   hearsay around that there was some guns, but none was charged

16   in the indictment and no arrests were made?

17   A.  To my knowledge, no arrests were made relating to

18   firearms.  That's correct, sir.

19   Q.  All right.  And the -- one of the biggest in this was the

20   leadership role.  And tell us why you thought Mr. Blackston was

21   a leader of this.

22   A.  All right.  I used, number one, the fact that he did send

23   a courier to Texas to pick up methamphetamine.  I used

24   information provided from others, that was also detailed in the

25   presentence report, that Mr. Blackston was responsible for

1   paying the courier upon their return.  I used information that
2   was provided that indicated that he had attempted to recruit
3   others in the DTO to make these trips to Texas.  The fact that
4   he is recruiting these people and he is responsible for their
5   payment suggests a leadership role.
6       It's also -- I also pointed out I think both in the
7   presentence report and in the addendum that the Hispanic
8   organization that he was working with was delivering the
9   methamphetamine Ice to him, and he was then for distributing it
10  to others or selling it to others, but he was the one receiving
11  it and then determining where it was going to go from there.
12  And that's the information I had and based on the material I
13  was provided.
14  Q.  All right, sir.  And that's the only information you had
15  about that?
16  A.  I'm checking to make sure I didn't cite anything else in
17  the presentence report, if that's all right.
18  Q.  As it related to the firearms -- I'm sorry.  Go ahead.
19  A.  Yeah, I apologize.  Just I want to make sure that that is
20  the information I used and did not leave anything out.  That is
21  it, the information I provided.
22  Q.  All right.  As it related to the firearms -- well, I think
23  we talked about that, though, and the only information you had
24  there was somebody said that they saw some guns somewhere?
25  A.  Well, and that they -- that they were at the defendant's

residence when -- when this first CS pulled up, four Hispanic males reached for firearms because they did not recognize this person.

Q. Is that Christine Miller?

A. It was labeled "CS" for purposes of the report, but I don't recall off the top of my head.

Q. I thought I saw that in here.

A. Christina Miller was the source identified as the one who discussed the incident in which the methamphetamine was stolen. There were firearms on the property at that moment, too, per her statement.

Q. But Mr. Blackston didn't have anything to do with the firearms?

A. He did not -- he was not in possession of them, no, sir. My -- the application of that guideline was based on case law that is cited in the addendum.

Q. All right. Now, the computation you made there, sir, would have come to -- I'm talking about on page 7 of --

A. Okay.

Q. -- your addendum.

A. I've got it. Go ahead.

Q. What was -- how many months did that come to?

A. I had two different computations. Presuming all your objections were sustained, the computation -- the offense level would have been a 23, and the guideline imprisonment range

1  would have been 92 to 115 months.

2  Q.  Uh-huh.

3  A.  If your objection to the quantity was sustained but all

4  other objections were overruled, the total offense level would

5  have been a 31 and the guideline imprisonment range would have

6  been 188 to 235 months.

7  Q.  All right.  And it's not in here, but there was a plea

8  agreement with the U.S. Attorney's office, too, that's on file

9  with the Court?

10  A.  A plea agreement, yes, sir.

11  Q.  To be sentenced within the lower 25 -- the recommendation

12  was for a sentence in the lower 25 percent of the guideline

13  range?

14  A.  Correct.

15  Q.  All right.  So that would put it down around 200 months.

16  Now, would you say -- just from a probation officer's

17  standpoint, would you say that 200 months is a substantial

18  sentence?

19  A.  It would be to me, but I can't speak on the guidelines.

20  The guidelines are what they are.  But for me personally, yes,

21  it would be a substantial sentence.

22  Q.  Now, as we've gone through this with everybody, you don't

23  have any evidence of any importation of the -- of this drug

24  from Mexico, do you?

25  A.  Just what was cited in the presentence report.

1    Q. All right. And that was about Jamilia Nix, I believe it

2    was, saying that she had to wait an extra day or so out in

3    Texas?

4    A. I -- I believe it was Ms. Nix, although I did not cite her

5    as such in the report. I just cited a CS telling the agent

6    what they heard at that time.

7    Q. All right. Okay. I also noticed that you apparently had

8    -- you received my sentencing memorandum to Your Honor, and

9    before you -- right before you did your addendum, I guess, and

10    you put in there that you wasn't speaking to the question of a

11    variance or anything.

12    A. Our office typically does not.

13    Q. Okay. All right. And -- but I put you on notice that I

14    was going to ask for one?

15    A. Yes, sir.

16    **MR. COATS:** No further questions of this witness,

17    Your Honor.

18    **THE COURT:** All right. Mr. Meynardie, any

19    cross-examination?

20    **MR. MEYNARDIE:** No, Your Honor.

21    **THE COURT:** All right. Officer Becker, you can step

22    down. Thank you for your time.

23    Mr. Coats, any other witnesses or evidence you want to

24    offer?

25    **MR. COATS:** Your Honor, the defendant would like to

call himself.

        **THE COURT:**  All right.  Mr. Blackston, come forward. Come forward, sir.  I need you to come up here.  Place your left hand on the Bible, raise your right hand, and take the oath.

HOSEA BLACKSTON,

was thereupon called as a witness and, having been duly sworn, testified as follows:

DIRECT EXAMINATION

- - -

        **THE COURT:**  Have a seat, Mr. Blackston, there in the witness stand.  You'll see a small microphone there in front of you.  I need you to speak into it, speak up, and speak slowly so the court reporter can hear you.  She can't type two people talking at once, so you have to let the lawyers stop talking before you answer.  Go ahead.

**BY MR. COATS:**

Q.  Mr. Blackston, it behooves me to advise you that you know you don't have to testify here, and if you do and if you tell any stories and the government can prove it, then you will lose your acceptance of responsibility.  Do you understand that?

A.  Yes, sir.

Q.  All right.  Now, you have heard the testimony?

A.  Yes, sir.

Q.  And I'm going to call your attention to each one of those

1  objections we had and ask you what you say about them.  Okay?

2  A.  Yes, sir.

3  Q.  Let's call your attention first to the crime itself.  That

4  was the Count Six of the indictment.

5  A.  Yes, sir.

6  Q.  And you have admitted that and pled guilty to that; is

7  that correct?

8  A.  Yes, sir.

9  Q.  Okay.  Now, did you have any way of determining the purity

10 levels of any of these drugs?

11 A.  No, sir.

12 Q.  All right.  So you had no knowledge of what any purity

13 levels might be; is that right?

14 A.  No, sir.

15 Q.  Did you at any time possess, own, or control any weapons?

16 A.  No, sir.

17 Q.  Did you ever use a weapon in terms of any of this?

18 A.  No, sir.

19 Q.  All right.  Now, you did buy and sell these drugs; is that

20 correct?

21 A.  Yes, sir.

22 Q.  This methamphetamine?

23 A.  Yes, sir.

24 Q.  And where did you get them?

25 A.  From Senon.

1   Q. Sir?

2   A. They came from Senon. He brought them to me out of Texas.

3   As far as I know, the drugs came out of Texas. Senon brought

4   them to me. Senon got them in June.

5   Q. All right. And then there came a time that you sent

6   someone else to get some?

7   A. No, I never sent no one.

8   Q. What about Jamilia?

9   A. This come up on -- in February. This happened in

10   February. I never just sent Jamilia anywhere. Jamilia chose

11   -- she overheard Senon asking where Samuel McDaniel was and

12   that he needed somebody to go make a trip to Texas for him.

13   And he -- I told him I knew I wasn't going. She mentioned

14   about something. I told her no. And he didn't want her to do

15   it. So he kept on, he was calling whoever he had supposed to

16   have been bringing the drugs from Texas. He didn't have the

17   money to fund them, and I didn't have no money to fund again to

18   bring no drugs. So that's how it came up when she went to

19   Texas to get them. And I never paid her anything for any

20   drugs.

21   Q. Ms. Nix lived with you; is that correct?

22   A. Yes, sir.

23   Q. Did you ever give her money?

24   A. Yeah, I worked. I gave her money for groceries, gas,

25   whatever else. Not for no drugs or nothing. She wasn't no

1    part of no drugs.  That's the only -- only time I ever known.

2    Q.  During this period of time, were you working anywhere?

3    A.  Yes, sir.

4    Q.  Where did you work?

5    A.  I worked for Chevron Refinery in Pascagoula, Mississippi.

6    Q.  And did that job play out?

7    A.  It played out for a couple of months.  They called me back

8    and we went to -- I went right back to work.  And when it

9    played out, I only -- the whole time I started there in 2010, I

10   probably was off about eight months the whole time.  Then when

11   it played out in June, I put in an application for the

12   shipyard.  I waited on my interview.  It was slow.  So I put in

13   for Mullinax Ford in Mobile, Alabama.  I got hired with

14   Mullinax Ford.  I worked there until I was arrested.

15   Q.  What were you doing there?

16   A.  I was a body shop tech.  I repaired cars.

17   Q.  All right, sir.  And did you have occasion to hire any of

18   these people that are involved in this conspiracy to work at

19   these other plants or anything?

20   A.  Never.  I never hired anyone.  I never asked any one of

21   them to do nothing or told anyone to do anything.

22   Q.  All right.  Now, were you ever a member of a Puerto Rican

23   Mafia?

24   A.  Never.  Don't even know what a Puerto Rican Mafia is.

25   Q.  Did you -- to your knowledge, did you know any Puerto

1  Ricans?

2  A.  No.  Only ones -- only people I know that were Puerto

3  Rican that worked with me at Chevron.

4  Q.  Did -- any of these people that bought dope from you or

5  anything, were any of them Mexicans?

6  A.  No, sir.

7  Q.  But some Mexicans did sell some dope to you?

8  A.  Yes, sir.

9  Q.  Okay.  So you wasn't in charge of any of these people?

10  A.  No, sir, I was not in charge of anyone.

11  Q.  You simply -- you bought some dope and you sold it?

12  A.  Yes, sir.

13  Q.  And anybody that had the money could have done that,

14  couldn't they?

15  A.  Oh, yes, sir.

16  Q.  You gave -- you gave a proffer to the agents, didn't you?

17  A.  Yes, sir.

18  Q.  You remember that?

19  A.  Yes, sir.

20  Q.  And you told them everything you knew about this, didn't

21  you?

22  A.  Yes, sir.

23  Q.  Everything you told them is guesses and estimates and all

24  that about the narcotics, wasn't it?

25  A.  Yes, sir.

1    Q.   But you don't -- you don't deny the lab reports or

2  anything like that, do you?

3    A.   No, sir.

4    Q.   And -- as to the quantity and the purity as it related to

5  you?

6    A.   Yes, sir.

7    Q.   What period of time, by the way, did that cover, that

8  proffer?  Were y'all talking about -- were you talking about a

9  period of four or five years or one or two years or what year?

10   A.   To my understanding, let's say from 2013 to the day the

11 indictment was did.

12   Q.   All right.  Now, I noticed that there were -- we received,

13 I believe, it was 12 letters from friends and relatives and so

14 forth of yours; is that correct?

15   A.   Yes, sir.

16   Q.   And then I forwarded those on to the Court?

17            **THE COURT:**  I received them.

18            **MR. COATS:**  All right, sir.

19 **BY MR. COATS:**

20   Q.   And I also told you that you could do an allocution

21 letter, and you did one; is that correct?

22   A.   Yes, sir.

23            **MR. COATS:**  Did you get that, Your Honor?

24            **THE COURT:**  I did.  I've read all of them.

25

1  **MR. COATS:** That's all I have of this witness, Your
2  Honor.
3  **THE COURT:** All right. Mr. Meynardie, any questions
4  from the government?
5  **MR. MEYNARDIE:** No, Your Honor. I'm going to
6  decline.
7  **THE COURT:** All right. Mr. Blackston, you can step
8  down. Thank you for your time.
9  Anything else, Mr. Coats?
10  **MR. COATS:** I believe we covered the weapons, Your
11  Honor.
12  **THE COURT:** Okay.
13  **MR. COATS:** He's -- you deny that, didn't you?
14  **THE DEFENDANT:** Yes.
15  **MR. COATS:** Okay. I think we covered that.
16  **THE COURT:** All right. Anything else, then, on
17  behalf of the defendant?
18  **MR. COATS:** Nothing further.
19  **THE COURT:** Does the government have anything in
20  rebuttal, Mr. Meynardie?
21  **MR. MEYNARDIE:** No, Your Honor.
22  **THE COURT:** All right. Any argument the parties wish
23  to offer? Mr. Meynardie?
24  **MR. MEYNARDIE:** Yes, sir.
25  Your Honor, I'm going to be fairly brief. As far as the

1   quantity is concerned, the 4.5 kilograms that was used by the
2   probation officer comes directly from an unprotected
3   post-Miranda statement of the defendant, and it is, based on
4   his estimates, was the lowest amount that he estimated that he
5   got from this group in Texas.  I think that's a fair
6   calculation of 4.5 kilograms.  That he's using Ice as opposed
7   to regular methamphetamine is confirmed by each of the six buys
8   that were made in this case which were all in the 94 to
9   98 percent range.  There was no evidence whatsoever in this
10  case that any of the methamphetamine was anything other than
11  Ice.  The amount of money that Mr. Blackston said he was paying
12  per kilogram is consistent with it being Ice.  So I think it's
13  -- there's more than sufficient evidence for the Court to find
14  that 4.5 kilograms is the correct quantity when it comes to Mr.
15  Blackston and that it was methamphetamine Ice, it was not some
16  lower form of methamphetamine.
17      As far as importation, I think the evidence is fairly
18  clear that Ms. Nix was delayed for some period of time because
19  of a problem in Mexico, and I think the fact that it was from
20  Mexico, as we had in the last hearing, the law is that if it
21  was imported, it doesn't matter whether Mr. Blackston knew it
22  was imported or not.  I don't think it's very credible that he
23  would not have known where it was coming from, but even if he
24  did, let's just assume that he did not know where the
25  methamphetamine was coming from, the fact that it was coming

1    from Mexico and the fact that he sold it is sufficient under

2    Fifth Circuit precedent to hold him accountable for that

3    enhancement.

4         I'm going to skip the leader and organizer for a moment

5    and come back to it.

6         The firearm enhancement, I think there's more than enough

7    evidence.  And one of the things that was not testified to by

8    anyone, I don't think, but as we read the presentence report,

9    there was also a statement made by Mr. Allen that he had

10   witnessed Hispanics shooting firearms off at Mr. Blackston's

11   residence and that they were -- as he put it, they were not

12   toys, they were assault-style weapons.  So I think there's -- I

13   don't think there's any question whatsoever that Mr. Blackston

14   did not have himself firearms, but I think it was certainly

15   reasonably foreseeable to him that those individuals who were

16   bringing the methamphetamine to him did, that they, in fact,

17   did have weapons, and that he was -- not only foreseeable to

18   him, but that he was aware that they had them.  There were at

19   least a couple of incidents where there were concerns about

20   stolen methamphetamine, someone coming into the residence that

21   the individuals didn't know and they drew their weapons or at

22   least showed their weapons, so I think it's fairly overwhelming

23   evidence that it was reasonably foreseeable to him that others

24   in the conspiracy did have firearms.

25        Now, finally, on the leader and organizer, I think the

1   requirement is that there be five or more individuals and that

2   Mr. Blackston controlled at least one of them.  And I think the

3   evidence here from Ms. Nix and from others, including an

4   intercepted Title III phone conversation after the conversation

5   -- after the interview that FBI agents had with Mr. Blackston,

6   he called Ms. Nix and discussed this trip and the fact that the

7   FBI didn't know about this trip.  So there's no question that

8   Ms. Nix took the trip, and it seems inconceivable that on this

9   one occasion, at least, that his girlfriend, his live-in

10  girlfriend, he would not have been the person who sent her to

11  get this methamphetamine.  Now, that is sufficient to satisfy

12  the four-point enhancement.  I will say that it also is

13  sufficient to satisfy the three-level enhancement, as well, and

14  it may well be that the Court finds that three levels is the

15  more appropriate level.

16      I think the evidence is that, as far as the rest of the

17  DTO, that he was more of a buyer/seller relationship.  He was

18  the one that was organizing getting in all this

19  methamphetamine, but then he was in a buyer/seller

20  relationship, I think, for the most part with the other

21  individuals downstream of him.  So although I think the

22  evidence is sufficient to sustain the four-level enhancement

23  that Mr. Becker gave him, it's also sufficient to give him the

24  three-level enhancement should the Court choose to do that.

25              **THE COURT:**  All right.  Any argument, Mr. Coats, you

1  want to offer?  Any further argument you want to offer?

2       **MR. COATS:**  Your Honor, I think we've pretty well

3  covered the objections that we had.  I would like to review the

4  variance arguments with you when we get a chance.

5       **THE COURT:**  All right.  I'll tell you what, I need to

6  resolve the objections first, and then we'll get to the

7  guidelines and calculate the guidelines, and then I'll hear

8  from you.

9       **MR. COATS:**  Yes, sir.  All right.  Well, Your Honor,

10  the only thing I can say is I think Mr. Becker on page 7 there

11  did a good job of setting out what the guidelines ought to

12  show, and that is, it doesn't have the enhancements on it, and

13  it -- but it clearly reflects that he would be in a very high

14  range there, anyway, up to 200 -- I don't have it in front of

15  me now, but it's -- that range was -- I don't see it, but it

16  was -- we covered it there in our testimony and the thing,

17  so --

18       **PROBATION OFFICER:**  I can reference something in the

19  addendum.

20       **MR. COATS:**  What was that range?

21       **PROBATION OFFICER:**  Which range are you --

22       **MR. COATS:**  That second one that you computed there.

23       **THE COURT:**  I have the ranges in front of me.  One

24  was 92 to 115 months, and the other was 188 to 235 months.

25       **MR. COATS:**  Yes, sir, that's it.  And nothing further

1    Your Honor, on that.

2        Your Honor, if I may, there's one other thing I ought to

3    say for the record.  The defendant doesn't feel that the

4    government has -- or the probation officer has set out or

5    proven the guidelines enhancements that we have objected to by

6    a preponderance of the evidence as is required for Your Honor

7    to rule in their favor.  The fact is, they've produced little

8    or no evidence other than some hearsay.

9        **THE COURT:**  All right.  This matter is before the

10    Court on the objections to the presentence report.  I've

11    considered the presentence report, the record in this case, and

12    the evidence that's been adduced at the hearing here today.

13    I've also considered the relevant legal authorities and the

14    guideline provisions at issue here.  The first objection

15    pertains to the calculation of the drug quantity for which the

16    defendant was held responsible in calculating the guidelines

17    and the offense level.

18        Paragraph 200 of the presentence report calculated the

19    base offense level as a 38 based on the defendant's possession

20    of 4.5 or more kilograms of methamphetamine Ice or actual

21    methamphetamine.  The defendant objects to that calculation and

22    takes the position that aside from the actual count of

23    conviction to which he pled guilty, a possession with intent to

24    distribute count, that was the only occasion involving actual

25    methamphetamine or Ice and that others -- none of the others

1    that were connected to him should be held or calculated as

2    though they are Ice to reach that amount.

3        The Court has to make findings on these issues by a

4    preponderance of the evidence, and in reaching a conclusion on

5    this particular objection, the Court notes the following for

6    the record:  The 4.5-kilogram quantity was an amount the

7    defendant himself provided in an unprotected statement.  It was

8    not from the proffer.  It was from a statement given before his

9    proffer which was given at a later date.  And the proffer and

10   the information derived from the proffer has not been used, and

11   the Court has not considered it in calculating his guidelines

12   in this case.  The 4.5 kilograms was actually the lower end of

13   the estimate he provided, and that was for methamphetamine.

14   It's also noteworthy that in that same statement, the defendant

15   has estimated himself that he had received between 200 and

16   400 pounds of marijuana.  That's not really been something

17   that's been emphasized here today, but it is nevertheless part

18   of the statement and the presentence report.  So the Court

19   finds that that quantity is supported by an adequate foundation

20   in the record.

21       The question is whether the record supports the conclusion

22   that all of it was actual methamphetamine or Ice.  The

23   evidence, including the testimony here today, reflects that

24   there were two buys made directly from Mr. Blackston, and based

25   on the lab reports from those buys, the purity was extremely

high and qualifies as Ice.  There were several other buys that
were made from other members of the organization who had
obtained their drugs from Mr. Blackston, and those, likewise,
tested in a range that qualified them as Ice.  The price that
was being paid was consistent with Ice or actual
methamphetamine.  And finally, I would also note that in the
factual basis, which was read at the plea in this case, states
that when the FBI did seek out Mr. Blackston and interview him,
he confessed that he had been receiving shipments of crystal
methamphetamine from co-defendant Senon Guzman.  And Mr.
Blackston agreed with the factual basis read at the plea, and
so he acknowledged he had been receiving shipments of crystal
methamphetamine, which certainly would imply more than two
particular buys made directly from him, himself, that involved
crystal meth.

Taking all of these factors into consideration, including
also the statements made by various co-defendants and
confidential sources as part of this investigation which are
reflected in the presentence report and, in the Court's view,
have not been rebutted, the Court is confident by a
preponderance of the evidence that the drug quantity is
properly calculated in the presentence report and the defendant
is properly held accountable for four and a half kilograms of
actual methamphetamine.  That objection will be overruled.

Turning to the objection to the enhancement for

importation, the presentence report increased the offense level
by two levels pursuant to Section 2D1.1B5 of the guidelines
which states that if the offense involved the importation of
amphetamine or methamphetamine or the manufacture of
amphetamine or methamphetamine from listed chemicals that the
defendant knew were imported unlawfully and the defendant is
not subject to an adjustment under Section 3B1.2 for mitigating
role, the offense level is increased by two levels. Here, the
defendant is not subject to a mitigating role adjustment, and
there has been, in the Court's view, no persuasive evidence
adduced to rebut the statements contained in the presentence
report that the Court feels support the conclusion by a
preponderance of the evidence that this methamphetamine was
imported from Mexico. And I believe, as Mr. Meynardie
indicated, I think the record supports the conclusion that Mr.
Blackston knew it was imported from Mexico and knew where it
was coming from. But even if he did not, it wouldn't matter,
because the Court of Appeals has stated in *United States v.*
*Foulks*, F-O-U-L-K-S, 747 F.3d 914, that in addressing this
enhancement, the scope of actions that involve the importation
of drugs is larger than the scope of those that constitute the
actual importation.

The Fifth Circuit has held that the enhancement applies to
a defendant who possessed and distributed imported
methamphetamine even absent any showing that the defendant knew

it had been imported.  A defendant who possesses
methamphetamine that had itself been unlawfully imported is
subject to the enhancement, whether or not he knew of the
importation.  Furthermore, the Court -- the Fifth Circuit has
applied the enhancement even though the person from whom the
defendant purchased the methamphetamine had not personally
imported it.

So in this case, because the methamphetamine was imported,
even if Mr. Blackston did not know and even if he purchased it
from Mr. Guzman and Mr. Guzman himself had not imported it,
that would still be sufficient to support the two-level
enhancement in this case because the offense, on the whole, the
offense involved importation of methamphetamine.  So based on
the record before the Court, that objection will be overruled.

The next objection is to the two-level enhancement.
Specifically, Section 2D1.1B1 of the guidelines provides that
if a dangerous weapon, including a firearm, was possessed,
increase by two levels.  And the application note provides at
Application Note 11 that the enhancement for weapons possession
reflects the increased danger of violence when drug traffickers
possess weapons, and the enhancement should be applied if the
weapon was present, unless it is clearly improbable that the
weapon was connected with the offense.  So as long as the
weapon was present, the enhancement applies, even if the
defendant himself did not possess it, unless it is clearly

1   improbable that the weapon was not connected to the offense.

2        In this case, there is evidence and statements from a

3   number of sources that reflect that on more than one occasion,

4   individuals have witnessed members of a group that they refer

5   to as the Puerto Rican Mafia.  Whether or not they were really

6   Puerto Rican Mafia is not really material -- it doesn't really

7   matter -- but these individuals are a source of supply for Mr.

8   Blackston.  They were at his residence, and a number of them

9   were witnessed at the residence with various firearms on more

10  than one occasion, and on at least one occasion, they were

11  firing these weapons at the defendant's property.  And I

12  believe in one case, one of these individuals told a

13  co-defendant or a confidential source that they would not

14  hesitate to use deadly force if they had to.  They had the

15  weapons with them when they were investigating, for lack of a

16  better term, the incident which involved the disappearance of

17  some drugs.  And because all of this was taking place at the

18  defendant's property and these are the individuals with whom

19  the defendant was dealing, it is certainly not clearly

20  improbable that the weapons were connected.  Clearly they had a

21  connection to this drug conspiracy, and the Court finds that

22  the record supports the conclusion that that enhancement is

23  properly applied.  That objection will be overruled.

24       Turning to the objection to the four-level enhancement for

25  being a leader or organizer, this enhancement was applied

1   pursuant to Section 3B1.1 of the guidelines which states that

2   if the defendant was an organizer or leader of a criminal

3   activity that involved five or more participants or was

4   otherwise extensive, increase by four levels.  In this case,

5   there really can be no dispute that this criminal activity

6   involved five or more participants.  There are nine defendants

7   in this case, I believe.  There's evidence that a number of

8   individuals, Christina Miller, Larry Anderson, Samuel McDaniel,

9   Jamilia Nix, all themselves stated as part of this

10  investigation that they purchased methamphetamine from Mr.

11  Blackston.  Other defendants were in business selling

12  methamphetamine that Mr. Blackston obtained from sources

13  outside of the area.  And the record easily supports the

14  conclusion that there were five or more participants and that

15  this was an otherwise extensive organization.  It went on for

16  an extended period of time, involved trips back and forth to

17  obtain drugs and return them.

18      And so the question becomes, then, whether the defendant

19  qualifies as an organizer or leader of this activity.  To

20  qualify for an adjustment, the defendant must have been the

21  organizer, leader, manager, or supervisor of one or more other

22  participants.  And in this case, the Court finds credible the

23  statements in the record that reflect that the defendant did

24  send Jamilia Nix on a trip as a courier and then attempted to

25  recruit others on other occasions to do the same, and so that

1 prong of the test is satisfied.

2         In determining whether a leadership or organizational role
3 is applicable in a particular case, the Court should consider a
4 number of factors such as the exercise in decision-making
5 authority.  In this case, the defendant clearly exercised a
6 decision-making role in this group.

7         The nature of participation in the commission of the
8 offense.  He was heavily involved in the offense and was
9 identified as the main or major source of supply in the area.
10 The drugs were all coming to him.  He recruited at least one
11 accomplice and attempted to recruit others.

12         Based on the findings that have been made so far here
13 today, he set the price.  He was involved in planning or
14 organizing.  Obviously as these shipments arrived, they were
15 taken back to an area at his residence where they were broken
16 down.

17         And the nature and scope of the activity was extensive and
18 went on for a period of time and involved extremely large
19 quantities of drugs; indeed, quantities of drugs so large that
20 the defendant is at an offense level 38, which is the highest
21 offense level under the drug guideline, the highest base
22 offense level, if I'm not mistaken.

23         So based on all of that, the Court is satisfied that the
24 evidence supports the conclusion that the leadership
25 enhancement was properly applied.  That objection will be

1    overruled.

2         Based on the foregoing, the guideline calculations would

3    be as follows:  The offense level would be a 43.  The Criminal

4    History category would be a VI.  The guideline range for

5    imprisonment under the sentencing guidelines would be life

6    imprisonment; however, the -- this offense has a statutory cap

7    of 40 years, so the maximum sentence is 480 months or 40 years,

8    and that would be the guideline range.  Supervised release

9    range is four to five years.  The defendant is not eligible for

10   probation.  The fine range is $25,000 to $5 million.

11   Restitution is not applicable.  There's a $100 special

12   assessment owed.

13        Do the parties agree those are the correct guideline

14   computations based on the Court's rulings?

15              **MR. MEYNARDIE:**  Yes, sir.

16              **THE COURT:**  Mr. Coats?

17         **MR. COATS:**  Your Honor, is it at this point we --

18              **THE COURT:**  Well, the first question I have is do you

19   agree that based on the Court's rulings, those are the correct

20   guideline computations?

21              **MR. COATS:**  Yes, sir, that's correct guidelines.

22              **THE COURT:**  All right.  The Court will adopt the

23   presentence report and addenda as the Court's findings of fact

24   along with the additional findings made here today.

25         Also I will note for the record I did receive the

defendant's sentencing memorandum. I've read it and considered

it. I've also received a number of letters that were submitted

on behalf of the defendant, including a letter from Mr.

Blackston himself. I've read all of those, as well, and they

will be made exhibits to the hearing here today.

At this time, Mr. Coats, if you would like to make your

motion, this would be the time to do so.

**MR. COATS:** At this time, the defendant, Mr.

Blackston, would move this honorable Court for a variance

downward on this -- on the sentence in this case.

I guess one of the things that caught my eye in looking at

all of this is that based on 18 USC 3553(a), every sentence

imposed in federal courts must be sufficient but not greater

than necessary. This is the starting point for every

sentencing decision. The statutory provision requires judges

to consider a number of factors in determining the appropriate

punishment. The factors include a person's history and

characteristics, the seriousness of the offense committed and

its nature and circumstances, the need or lack of need to

protect the public and to deter criminal conduct, and the

individual defendant's need for education, vocational training,

or medical care, and the need to avoid unwarranted sentencing

disparity.

Now, when we apply these factors to Mr. Blackston's case,

we take a look then at 3553(a)(1) which requires the Court to

consider the nature and circumstances of the offense and the
history and characteristics of the defendant.  First considered
is the nature and circumstances of Mr. Blackston's offense.  He
acknowledges, Mr. Blackston does, that this subject conviction
involved a relatively large quantity of drugs.  He acknowledged
that he did it, that he was sorry for doing it.  He recognizes
that he has a history of these types of problems of selling
drugs.  The evidence has shown, as we have gone over it, that
he is not a violent person, in spite of the fact that somebody
saw or says they saw some guns in the hands of somebody, who we
don't know who they are, around his place of business over some
drugs that had gone missing or something.  I don't think we
ever got to the bottom of that.  But at any rate, Mr. Blackston
has no violent history.

He is a 41-year-old black male who has spent at least half
his life in prison, probably, or a good bit of it.  Of the time
that he has been out, he has been very productive, which is
amazing.  He has been a person who has -- as Your Honor
reviewed those letters and all, the people in the community
think a lot of him.  He has given of his time and efforts, been
an usher at Mount Pleasant Methodist church.  He has -- he has
conducted himself in some good ways, as well as this bad way.
When I look at it -- and he has two teenage children.  I guess
you would say teenagers; one is 11, I think, and one is 16.
Then his live-in lady friend is pregnant now.  I think she's

1    five or six months pregnant.  She's also a co-defendant in this

2    indictment.

3         Now, I have to keep going back to the sentence should be

4    sufficient but not greater than necessary.  Well, I don't

5    really understand what would be sufficient.  I know 20 years

6    would be pretty sufficient, as we heard Mr. Becker say.

7    Certainly we wouldn't want it to apply to any of us.  Forty

8    years is beyond comprehension.  That puts him in his eighties.

9    That's what the guideline range was.  So that's what I'm asking

10   Your Honor to consider is, consider a variance downward of not

11   just two levels, but of something significant like -- just give

12   him a chance.  I mean, 20 years would make him in his sixties.

13   The man can be a productive citizen.

14        All the people that deal with all the sentencing, they all

15   talk about the problems that we have and who makes these

16   problems up.  This case, this type of case, is the very kind of

17   case that accounts for most of -- or not most, I can't say

18   most, but anywhere from 35 percent up of the people that are

19   serving long sentences in prison.  Now, a long sentence takes

20   him off the streets.  It does him in.  I mean, he won't be back

21   to bother anybody, but -- and he never did bother anybody

22   except in selling this dope.  And that is a serious crime, and

23   I don't make light of it.  And I would be very upset if he had

24   sold any of that to any of my kids.

25        But on the other hand, I think that a sentence of 20 years

1    would be enough to deter people and that I -- I just believe

2    that, you know, there's other interesting stats there, and if

3    Your Honor -- I'm sure Your Honor read this and had read it

4    before, even, in the annual report, where they concluded that

5    offenses involving methamphetamine most common accounting for

6    26.2 percent -- I'm sorry -- of all drug cases.  The report

7    also concluded that less than 46 percent of all cases were

8    sentenced within the guideline range.  So as you checked around

9    the country, you found that the 2014 data showed a noticeable

10   decrease in the within-range of sentencing imposed in drug

11   trafficking cases and the increase in variances granted.

12        I don't know what else to say about him that is not said

13   in those letters.  And even when you read the letter from Mr.

14   Blackston, you could see it's really a shame.  This man is a

15   personable man, a man who is self-educated to a great deal

16   because he passed a number of tests in performing welding and

17   all sorts of job skills.  He is a man whose hobby was race

18   cars, and he worked on them and all up there on his property.

19   He worked on any elderly people's cars for nothing.  He did a

20   lot in the community.  He was -- and of course -- and for those

21   reasons, it really hurts you to see someone like that who is

22   probably a role model to a number of kids be charged with

23   committing a crime like this.

24        But he told you that he is really sorry for letting down

25   the folks in his community.  He's sorry for letting down his

1    family.  He's sorry for all that.  He let the gambling and

2    drinking get ahold of him.  And he tells us that in his

3    allocution letter, and I believe it.  And that's what his mama

4    said, too.

5        I think that there's -- that he still has a lot to offer,

6    and I think that if he's given a chance to get out some day, I

7    could visualize him working hard in his church and community to

8    offer that and to be somebody that his kids could be proud of.

9    Because he loves his kids very much.  That's something that

10   really comes through in those letters.

11       Your Honor, I don't know what to say except that this is a

12   really harsh sentence that he's looking at under the

13   guidelines, and I would ask the Court to seriously consider a

14   considerable variance.  I mean, if the Court -- if the Court

15   sentenced him to 20 years, that puts him at over 60 when he

16   gets out.  His kids will be grown and gone, and he will have

17   only had a chance to deal with them in visitations.

18       I don't know what else to say, Your Honor, other than I've

19   come to know him over the number of visits I've seen him, not

20   as well as these folks that have lived with him and all, but I

21   have noticed one thing about him:  In all his dealings with me,

22   he has been completely truthful.  There's not a doubt in my

23   mind that he is sorry for what he's done.  He let his greed for

24   alcohol and the high-living life of gambling take control of

25   his life, and then he had to find a way to get extra money to

cover that, and the only way he knew was the life that's available out in the community, and that is what he's doing.

He's also, though, on the other end, doing really good things. And that's what amazes me, is that this man was making -- he was a very productive man, and his earnings, if Your Honor looks at it, for doing the jobs he was doing, was reasonably high. So it's very hard for me to stand here and try to measure this out.

I simply ask the Court to think, you know, what is a sufficient but not greater than necessary sentence. I don't know. But I would ask the Court to consider that statement very much. Thank you, sir.

**THE COURT:** All right. Thank you, Mr. Coats.

Does the government have any response on the motion, Mr. Meynardie?

**MR. MEYNARDIE:** We do not, Your Honor, although we do recommend the lower 25 percent of whatever guideline range the Court finds appropriate.

**THE COURT:** All right. The Court, for the record, will accept the recommendation of the government in that respect.

Mr. Blackston, you have what is known as the right of allocution. That's your opportunity to address the Court and say anything you would like to say on your own behalf before the Court imposes sentence. You may address the Court yourself

1    if you wish, or if you would rather your attorney speak for
2    you, that's fine, too.  Either way, I'm going to have you both
3    approach the podium.  And if you do choose to speak, I remind
4    you that you are still under oath.  So if you will please come
5    forward at this time, I'll hear anything else there is to be
6    offered on behalf of the defendant.
7         Mr. Coats, if you'll come forward, also, please.
8         Anything on behalf of the defendant?
9         **THE DEFENDANT:**  First I'd like to say I'm very sorry.
10   I'm truly sorry for what I did.  I committed a crime.  What I
11   know -- actually the amount that was said, I never had my hands
12   on that amount.  I just know that amount was in the areas that
13   came.  Never all of it that came directed to me.
14        I dismissed myself from the drug life to work and to be
15   there for my kids.  I wanted to do better.  I don't want them
16   to come up like me.  I'm just sorry.
17        I work hard.  I work hard.  I even -- I even helped mostly
18   half of the co-defendants that spoke up against me to jobs,
19   that I couldn't believe they would let me down by not telling
20   the truth.  What I spoke and said was the truth.  And I'm
21   really sorry.  I let everybody down.
22        **THE COURT:**  All right.  Thank you.
23        Anything else, Mr. Coats?
24        **MR. COATS:**  Nothing further, Your Honor.
25        **THE COURT:**  Anything else from the government?

**MR. MEYNARDIE:** No, Your Honor.

**THE COURT:** Before I do proceed any further, Mr. Blackston, I do want to explain to you, as part of your plea agreement in this case, you waived the right to appeal your conviction and sentence in this case. However, if you did choose to try and file an appeal, I need to make sure you understand that you would have 14 days to do so from the date the Court enters a judgment. After you did that, if you wished, you could ask -- if you were unable to pay appeal costs, you could ask for the right to proceed in forma pauperis, which would mean proceeding on an appeal without paying any appeal costs. Do you understand these appellate rights, Mr. Blackston?

**THE DEFENDANT:** No, sir.

**THE COURT:** All right. Well, do you understand what I'm telling you, that if you were going to try and pursue an appeal and file a notice of appeal, you would only have 14 days to do that after I enter a judgment? Do you understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** You also understand that if you could not afford to pay the appeal costs, you could ask for permission to proceed without paying those costs? Do you understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** All right.

This matter is before the Court on the defendant's motion

1    for a variance as well as for sentencing.  As stated earlier,

2    the Court has found that the presentence investigation report

3    and addenda are adopted.  There's a mandatory minimum sentence

4    in this case.

5        The Court's determination of the advisory guideline range

6    is as follows:  An offense level of 43, a Criminal History

7    category of a VI.  The imprisonment range under the guidelines

8    would be life.  That is statutorily capped at 480 months, so

9    the guideline range is 480 months.  Supervised release range is

10   four to five years.  Fine range is $25,000 to $5 million.  The

11   fine will either be waived or below the guideline range due to

12   inability to pay.  The sentence is within an advisory guideline

13   range that is not greater than 24 months.  The Court finds no

14   reason to depart under the guidelines, and restitution is not

15   applicable.

16       In considering the motion for variance and the sentence

17   itself, the Court must consider the statutory sentencing

18   factors found at Title 18, United States Code, Section 3553.

19   And this Court, in this case, I find the following factors are

20   relevant:  The nature and circumstances the offense and the

21   history and characteristics of the defendant.  In this case,

22   obviously this is a serious offense involving the trafficking

23   and distribution of extremely large quantities of

24   methamphetamine, crystal methamphetamine.  It took place over

25   an extended period of time.  And as the Court has found, the

defendant occupied the role of a leader or organizer in this
group.  It involved individuals who were frequently armed.  And
even if Mr. Blackston himself was not violent, certainly he was
introducing other individuals into the community who apparently
were prepared to use violence.  One of the reasons the
defendant is facing the lengthy term of imprisonment that he
is, is because of the large quantities of drugs involved here,
but another is his criminal history, which is extensive and
places him in a Criminal History category of VI, which is the
highest category there is under the guidelines.  So some of his
circumstance is the result of his criminal past, and some of
that past, a fair amount of it, involves prior convictions for
either possession or transfer of controlled substances.
Indeed, he was on probation or postrelease supervision for one
of those drug offenses at the time he committed this offense.
So the Court notes all of those factors when considering a
sentence in this case.

As stated, the sentence needs to reflect the seriousness
of this offense and to promote respect for the law.  Mr.
Blackston's past indicates that he has not demonstrated a lack
of respect for the law.

And the sentence also needs to afford a just punishment.

The sentence needs to afford adequate deterrence to
criminal conduct.  Mr. Blackston has not been deterred by his
past dealings with the criminal justice system from engaging in

1    this type of conduct.

2         The sentence also needs to deter others who may be

3    inclined to engage in this kind of conduct.

4         The sentence needs to protect the public.  Introduction of

5    these kinds of drugs into the community is a serious threat to

6    public health and safety.  Furthermore, introducing some of

7    these individuals who were involved in this case, heavily armed

8    apparently, is also a threat to public safety, and that is

9    another factor the Court must consider in fashioning a

10   sentence.

11        Based on all the foregoing and having considered the

12   advisory sentencing guidelines and the other sentencing factors

13   found at Title 18, United States Code, Section 3553, and having

14   given serious consideration to this case and the arguments of

15   counsel made in support of a variance, which was very

16   thoughtfully argued, I believe, by Mr. Coats, and I certainly

17   appreciate his comments, I'm also cognizant of the fact that we

18   are looking at someone at the very high end of the guideline

19   range in terms of his criminal history and the drug quantity

20   involved; indeed, someone who would be looking actually at more

21   time were there not a statutory cap.

22        Given the level of the defendant's involvement and role in

23   this offense, it is therefore the judgment of the Court that

24   the defendant, Hosea Blackston, is hereby committed to the

25   custody of the Bureau of Prisons for a term of 480 months as to

1    Count Six of the indictment.  The motion for variance is

2    denied.

3         It is further ordered that the defendant pay a fine of

4    $10,000 which is due immediately.  Payment of the fine shall

5    begin while the defendant is in custody.  Upon release from

6    imprisonment, any unpaid balance shall be paid at a rate of not

7    less than $150 per month beginning 30 days from release from

8    custody.  Said fine is a departure from the applicable

9    guideline range and is based upon the defendant's ability to

10   pay.  The Court finds that the defendant does not have the

11   ability to pay interest, and the Court will waive the interest

12   requirement in this case.  In the event that the fine is not

13   paid in full prior to the termination of supervised release,

14   the defendant is ordered to enter into a written agreement with

15   the Financial Litigation Unit of the U.S. Attorney's office for

16   payment of the remaining balance.  In addition, the value of

17   any future discovered assets may be applied to offset the

18   balance of criminal monetary penalties.  The defendant may be

19   included in the Treasury Offset Program allowing qualified

20   federal benefits to be applied to offset the balance of

21   criminal monetary penalties.

22        Upon release from imprisonment, the defendant shall be

23   placed on supervised release for a term of five years.  Within

24   72 hours of release from the custody of the Bureau of Prisons,

25   the defendant shall report in person to the probation office in

the district to which the defendant is released. While on
supervised release, the defendant shall comply with the
mandatory and standard conditions that have been adopted by
this Court and he shall not possess a firearm.

In addition, the following special conditions are imposed:
Number one, the defendant shall provide the probation office
with access to any requested financial information.

Number two, the defendant shall not incur new credit
charges or open additional lines of credit without the approval
of the probation office unless the defendant is in compliance
with the installment payment schedule.

Number three, the defendant shall participate in a program
of testing and/or treatment for alcohol and/or drug abuse as
directed by the probation office. If enrolled in an alcohol or
drug treatment program, the defendant shall abstain from
consuming alcoholic beverages during treatment and shall
continue abstaining for the remaining period of supervision.
The defendant shall contribute to the cost of such treatment in
accordance with the probation office co-payment policy.

Number four, the defendant shall not possess, ingest, or
otherwise use a synthetic cannabinoid or other synthetic
narcotic unless prescribed by a physician.

Number five, in the event the defendant resides in a
jurisdiction where marijuana has been approved or legalized,
the defendant shall not possess, ingest, or otherwise use

1    marijuana unless prescribed by a physician.

2         Number six, the defendant shall submit his person,

3    property, house, residence, vehicles, or papers to a search

4    conducted by a United States probation officer.  Failure to

5    submit to a search may be grounds for revocation of supervised

6    release.  The defendant shall warn any other occupants that the

7    premises may be subject to searches pursuant to this condition.

8    An officer may conduct a search pursuant to this condition only

9    when reasonable suspicion exists that the defendant has

10   violated a condition of his supervision and that the areas to

11   be searched contain evidence of this violation.  Any search

12   must be conducted at a reasonable time and in a reasonable

13   manner.

14        It is further ordered that the defendant pay a special

15   assessment fee of $100 which is due immediately.

16        Pursuant to Title 21, United States Code, Section

17   862(b)(1)(A)(i), the defendant shall be ineligible for any and

18   all federal benefits for a period of one year.

19        The Court further recommends that the defendant be housed

20   in a facility closest to his home for which he is eligible for

21   purposes of visitation.  The Court further recommends that the

22   defendant be allowed to participate in the Bureau of Prisons

23   500-hour substance abuse treatment program.

24        Further, in the event the Court incorrectly calculated any

25   of the guidelines in this case or otherwise incorrectly ruled

1    on any objections, the Court would nevertheless have imposed

2    the same sentence as a non-guideline sentence based upon its

3    analysis of the Section 3553 factors stated earlier.

4           The defendant will be remanded to the custody of the U.S.

5    Marshals Service to await designation by the Bureau of Prisons.

6    That will be the judgment of the Court.

7           Anything further at this time?

8              **MR. COATS:**  Your Honor --

9              **MR. MEYNARDIE:**  Move to dismiss the remaining counts,

10   Your Honor.

11             **THE COURT:**  That motion is granted.

12          Yes, sir?

13             **MR. COATS:**  Your Honor, could the Court ask the

14   Department of Corrections or whoever it is to place him at a

15   facility closest to his --

16             **THE COURT:**  I did -- I think I did make that

17   statement.  I did make that recommendation.  That will be part

18   of the sentence.

19             **MR. COATS:**  Okay.

20             **THE COURT:**  Anything further?  All right.  Court is

21   adjourned.

22                   (HEARING CONCLUDED AT 11:50 A.M.)

23                          - - -

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3           I, Kati M. Vogt, RPR, RMR, CRR, Official Court

4    Reporter for the United States District Court for the Southern

5    District of Mississippi, appointed pursuant to the provisions

6    of Title 28, United States Code, Section 753, do hereby certify

7    that the foregoing is a correct transcript of the proceedings

8    reported by me using the stenotype reporting method in

9    conjunction with computer-aided transcription, and that same is

10   a true and correct transcript to the best of my ability and

11   understanding.

12           I further certify that the transcript fees and format

13   comply with those prescribed by the Court and the Judicial

14   Conference of the United States.

15

16                      /s/KATI M. VOGT, RPR, RMR, CRR
                        OFFICIAL COURT REPORTER
17

18

19

20

21

22

23

24

25